UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
99 DEC 27 PM 1:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
DEC 27, 1999

BARRY P. LANGFORD, LUCIA )
KAYE MORGAN, DANIEL C. )
STUBBS, JR., KIMBERLY L. )
DUDLEY, and SCOTT W. BLYTHE, )
individually and as )
representatives of a class )
of persons similarly )
situated, )
 )
    Plaintiffs, )
 )
vs. ) Civil Action No. CV-99-S-2651-NE
 )
RITE AID CORPORATION and )
RITE AID OF ALABAMA, INC., )
 )
    Defendants. )

## MEMORANDUM OPINION

This action is before the court on defendants' motion to dismiss plaintiffs' amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). A court may dismiss a complaint for failure to state a claim upon which relief can be granted "only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *see also Wright v. Newsome*, 795 F.2d 964, 967 (11th Cir. 1986) ("[W]e may not ... [dismiss] unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claims in the complaint that would entitle him or her to relief.").

To that end, the court must "accept as true all well-pleaded factual allegations and ... view them in a light most favorable to the nonmoving party." *Williams v. City of Montgomery*, 21 F.Supp.2d 1360, 1363 (M.D. Ala. 1998); *see also Deerman v. Federal Home Loan Mortgage Corporation*, 955 F.Supp. 1393, 1397 (N.D. Ala. 1997) ("The court must take factual allegations as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff.") (citing *In re Johannessen*, 76 F.3d 347, 350 (11th Cir. 1993)). The threshold requirements for a complaint to survive a Rule 12(b)(6) motion thus are "exceedingly low." *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 703 (11th Cir. 1985).

## I. FACTUAL BACKGROUND

The five named plaintiffs, individually and on behalf of a putative class of persons allegedly similarly situated, commenced this action on September 30, 1999. They amended their complaint on October 19, 1999. Plaintiffs allege that defendants engage in a policy of "up charging": that is, charging a higher retail price for prescription medications sold to customers who lack health insurance. (Amended complaint (Doc. No. 5) ¶ 19.) Plaintiffs claim that defendants developed a computer program designed to

2

increase the retail price of prescription drugs dispensed to customers without health insurance, and that the program "is implemented by directions, instructions, and orders sent to the point of sale by the United States Mail or by wire and telephone transmissions by which prices were to be and in fact were — and continue to be — manipulated." (*Id.*)

Plaintiffs accuse defendants of thereby engaging in a "scheme and artifice to defraud, and obtain money by false pretenses, from its customers who purchased medication from the defendants without the benefit of health insurance that provided reimbursement for the cost of the medication" (*id.* ¶ 10), and assert that such scheme "violates the mail and wire fraud prohibitions of 18 U.S.C. §§ 1341 and 1343." (*Id.* ¶ 21.)

Plaintiffs conclude that defendants thereby have violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et *seq*. Plaintiffs also contend such allegations give rise to causes of action for unjust enrichment and money had and received under the law of the State of Alabama.

Because plaintiffs' RICO charge is the lone claim affording this court subject matter jurisdiction, *see* 28 U.S.C. § 1367, the court addresses it first. Only if this court denies defendants'

3

motion as to plaintiffs' RICO claim will it entertain plaintiffs' supplemental state law claims. *See Graham v. State Farm Mutual Insurance Company*, 193 F.2d 1274, 1282 (11th Cir. 1999).[1]

## II. DISCUSSION

That section of RICO defining "prohibited activities" provides in relevant part that:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to sue or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. ...
>
> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
>
> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs

---

[1] The Eleventh Circuit noted in *Graham*:
> Because this court's jurisdiction over plaintiff's state law claims depends on the viability of her claims under the FMLA, the court will address the claims over which it has original jurisdiction before proceeding to consider, if necessary, the state law claims. If no federal claim survives [a motion to dismiss], the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3).

*Graham*, 193 F.3d at 1282.

4

> through a pattern of racketeering activity or collection
> of unlawful debt.
> **(d)** It shall be unlawful for any person to conspire
> to violate any of the provisions of subsection (a), (b),
> or (c) of this section.

18 U.S.C. § 1962. As thus phrased, RICO essentially is a criminal statute. *See Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649 (S.D.N.Y. 1996) (Sweet, J.) ("The RICO provisions of the Organized Crime Control Act of 1970 were enacted expressly, as set forth in the preamble to the Act, 'to seek the eradication of organized crime in the United States.' Pub.L. No. 91-452 (1970).").

The Act nevertheless provides civil penalties for private parties who have been injured "by reason of" a RICO violation. 18 U.S.C. § 1964(c). As Senior Judge Robert W. Sweet of the United States District Court for the Southern District of New York aptly observed in *Katzman*,

> "Civil RICO is an unusually potent weapon — the litigation equivalent of a thermonuclear device." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991). Because the "mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants, ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990). ...

167 F.R.D. at 654-55. The four elements of a civil RICO action are "(1) conduct (2) of an enterprise (3) through a pattern (4) of

5

racketeering activity." *Durham v. Business Management Associates*, 847 F.2d 1505, 1511 (11th Cir. 1988) (quoting *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). The pivotal point of proof for civil plaintiffs, however, is demonstration of a "pattern of racketeering activity." A "pattern" is established by "at least two" predicate acts of "racketeering activity" within a ten year period. 18 U.S.C. § 1961(5). The phrase "racketeering activity" is defined in section 1961(1)(B) as meaning, among other things, "any act which is indictable under" a specified list of federal criminal offenses, including mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.

The elements of mail and wire fraud are virtually identical, with these differences only: mail fraud requires proof of use of the the United States Postal Service to transmit information, whereas wire fraud requires proof of use of interstate wires to do so. *See Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991). To establish a violation of either statute,[2] therefore,

---

[2] The mail fraud statute, 18 U.S.C. § 1341, provides:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or

6

plaintiffs would have to prove these facts: *first*, that defendants knowingly devised or participated in a scheme to defraud plaintiffs, or for obtaining money from plaintiffs by means of false or fraudulent representations of a material fact; *second*, that defendants did so willfully, with an intent to defraud; and *third*, that defendants <u>either</u> used the United States Postal Service to mail some matter or thing, <u>or</u> transmitted some communication in interstate commerce by means of a wire, for the purpose of executing the scheme to defraud. *See Neder v. United States*, ___ U.S. ___, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35 (1999) (holding that "materiality of falsehood is an element of the [scheme or artifice to defraud under the] federal mail fraud, wire fraud, and bank fraud statutes")[3]; *see also Eleventh Circuit Pattern Jury*

---

spurious article, for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

The wire fraud statute, 18 U.S.C. § 1343, provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

[3] The *Neder* Court concluded, based on the common-law conception of the term

7

*Instructions - Criminal*, Offense Instructions 41.1, 42.1, at 225, 230 (1997).

Plaintiffs do not assert that defendants made affirmative misrepresentations regarding their practice of "up charging." Rather, they contend defendants suppressed a material fact: that is, defendants failed to inform uninsured customers they would be charged a higher price for prescription medication than the amount paid by insured patrons and their insurance carriers.

Even so, "material omissions can be the basis for a claim of fraud if they are intended to create a fraudulent representation." *Beck v. Prupis*, 162 F.3d 1090, 1096 (11th Cir. 1998), *cert. granted*, ___ U.S. ___, 119 S.Ct. 2046, 144 L.Ed.2d 213 (1999). As stated by the Eleventh Circuit in an earlier case:

> We find no case law in this circuit to substantiate a claim that the misrepresentation must be active. Instead, we find that an essential element of mail fraud is that the defendant possess the specific intent to defraud, and that the intent to defraud be evidenced in any way, including non-action, on the part of the defendant. Fraud, for purposes of a mail fraud conviction, may be proved through the defendant's non-action or non-disclosure of material facts intended to create a false and fraudulent representation.

---

"fraud," that Congress "could [neither] have conceived of 'fraud' without proof of materiality," nor have "intended to drop that element from the fraud statutes." *Neder v. United States*, ___ U.S. ___, 119 S.Ct. 1827, 1840, 144 L.Ed.2d 35 (1999). Therefore, proof of a "scheme or artifice to defraud" requires a civil RICO plaintiff to show "misrepresentation or concealment of <u>material</u> fact" by a defendant. *Id.* (emphasis in original).

8

*United States v. O'Malley*, 707 F.2d 1240, 1247 (11th Cir. 1983).

Neither the *Beck* nor *O'Malley* decision should be read loosely, however,[4] because tort law uniformly requires a plaintiff to establish that a defendant was under a <u>duty</u> requiring the disclosure of material facts before the failure to do so may be made the foundation of a civil action for fraud. *See* 37 C.J.S. *Fraud* § 18 (1997) (collecting cases reflecting the general rule that mere silence, or failure to disclose a material fact, is not fraud "in the absence of a duty to speak").

> An exception to the rule that mere silence is not fraud exists where the circumstances impose on a person a duty to speak and he or she deliberately remains silent. It is well settled that the suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation. Where the law imposes a duty on one party to disclose all material facts known to him and not known to the other, silence or concealment in violation of this duty with intent to deceive will amount to fraud as being a deliberate suppression of the truth and equivalent to the assertion of a falsehood. . . .

---

[4] The opinion of Judge Coffey of the Seventh Circuit in Emery v. American General Finance, Inc., 71 F.3d 1343, 1349 n.1 (7th Cir. 1995) (Coffee, J., dissenting) is apropos:

> I am well aware that we have strayed a good distance from the original intent behind the RICO statute, which was to combat organized crime, and that the Supreme Court has to some extent validated that trend. . . . Nevertheless, the Supreme Court has also made it clear that RICO's "liberal construction" clause (see note following 18 U.S.C. § 1961) is not a blank check for those who wish to advance novel interpretations of the statute. . . . I believe it is important to resist further expansion of civil RICO through liberal interpretation of either RICO itself or of the various "predicate act" statutes, such as the mail fraud statute. [Citations omitted.]

9

*Id.* § 19 (1997) (footnotes omitted); *see also Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980) (noting that "[o]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when under a duty to do so").

A duty requiring disclosure of material facts may arise either from a statute or the particular facts and circumstances of a case. Plaintiffs have not cited, and this court has not discovered, any statute imposing a duty upon defendants to disclose their pricing practices for prescription medications. This court doubts that any such positive law exists. Thus, the specific issue to be determined is whether the particular facts and circumstances of this case, viewed in a light most favorable to plaintiffs, create a duty to disclose. *See, e.g., Dominick v. Dixie National Life Insurance Co.*, 809 F.2d 1559, 1570 (11th Cir. 1987) ("The existence of a duty to disclose depends on the particular facts and circumstances of each case.") (citing *Coosa Valley Bank v. Taylor-Holmes Industries*, 420 So. 2d 51, 54 (Ala. 1982) (holding that determination of "special circumstances" giving rise to duty to disclose requires a "case by case" analysis)); *see also Bonilla v. Volvo Car Corporation*, 150 F.3d 62, 70 (1st Cir. 1998) ("The

10

failure to disclose information may also constitute a fraudulent representation [under the mail and wire fraud statutes] if the defendant was under a legal, professional, or contractual duty to make such a disclosure ....") (quoting 2 Sand, Siffert, Loughlin & Reiss, *Modern Federal Jury Instructions*, ¶ 44.01, at 44-11 (1997)).

Generally speaking, common law historically has imposed a duty to disclose material facts upon a person who stands in a "confidential," "fiduciary," or some other special relationship to another person: that is, a relationship in which the latter person imposes trust and confidence in the former person, usually because of the former's peculiar education, skill, or knowledge. *See generally* 37 C.J.S. *Fraud* § 22 (1997) (collecting cases). *Cf. City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 573-74 n.43 (11th Cir. 1998) (recognizing Alabama case law that indicates the necessity of a "close relationship" between two parties before a duty to disclose arises), *cert. denied*, ___ U.S. ___, 120 S.Ct. 309 (1999).

For example, "[i]t is commonly said that a fiduciary relationship exists between [a] physician and [his or her] patient. ... This has occasionally led to the conclusion that physicians may be subject to liability in fraud for nondisclosure of material

11

information, apart from liability in malpractice or battery for failure to obtain informed consent ...." 2 Harper, James & Gray, *The Law of Torts* § 7.14, at 474 n.11 (2d ed. 1986) (citations omitted).

In another example, the United States District Court for the Southern District of Alabama held in a diversity action based upon Alabama law that the relationship between pharmacist and client is "a sufficient special circumstance" of "trust" as to impose upon a pharmacist the duty to disclose that he had dispensed the wrong medication. *See Griffin v. Phar-Mor, Inc.*, 790 F.Supp. 1115, 1117 (S.D. Ala. 1992). That "relationship of trust" and its concomitant duty of disclosure were deemed to grow out of

> the esoteric nature of the pharmacist's profession. A person wishing to become a pharmacist must hold a professional degree in pharmacy from a school approved by the Alabama Board of Pharmacy, must complete a practical training course approved by the Alabama Board of Pharmacy, and must pass an examination administered by the Alabama Board of Pharmacy. Ala. Code § 34-23-51. Pharmacists possess important specialized knowledge that is possessed by few, if any, non-pharmacists, and it is this specialized knowledge that puts patients in the position of having to put complete trust and confidence in a pharmacist's skill.

*Id.* at 1118.

This court does not dispute that the law of Alabama imposes some duties upon a pharmacist's relations with customers: that is,

12

the duty of accurately "decipher[ing] the doctor's handwriting and fill[ing] the prescription in accordance with the doctor's orders"; and, its mirror image, the duty to inform a customer promptly, whenever medication was incorrectly dispensed. These legal duties are tempered by the "learned intermediary doctrine." Although as originally formulated that doctrine limited the duty of pharmaceutical manufacturers to warn of the dangers of adverse side-effects from the use of prescription medications,[5] the Supreme Court of Alabama implicitly expanded the doctrine beyond pharmaceutical companies to pharmacists in *Stafford v. Nipp*, 502

---

[5] The seminal Alabama case discussing that aspect of the doctrine is *Stone v. Smith, Kline & French Laboratories*, 447 So. 2d 1301 (Ala. 1984), in which the Supreme Court of Alabama adopted the reasoning of the former Fifth Circuit in *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276 (5th Cir. 1974). The *Stone* court explained the doctrine as follows:
> We cannot quarrel with the general proposition that where prescription drugs are concerned, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use. This special standard for prescription drugs is an understandable exception to the Restatement's general rule that one who markets goods must warn foreseeable ultimate users of dangers inherent in his products. Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a 'learned intermediary' between manufacturer and consumer.

*Stone*, 447 So. 2d at 1304-05 (citations omitted).

13

So. 2d 702 (Ala. 1987).[6] Simply put, a pharmacist does not have a duty to question a physician's individualized medical judgment as to the propriety of a particular palliative for a patient, or to warn customers of the hazards of that drug. *See, e.g., Jones v. Irvin*, 602 F.Supp. 399 (S.D. Ill. 1985); *Nichols v. Central Merchandise, Inc.*, 817 P.2d 1131 (Kan. Ct. App. 1991); *McKee v. American Home Products Corp.*, 782 P.2d 1045 (Wash. 1989).[7]

---

[6] In *Stafford*, the consumer of a prescription drug sued both her physician and the pharmacist who filled her doctor's prescription. *See Stafford v. Nipp*, 502 So. 2d 702, 703 (Ala. 1987). Although the Alabama Supreme Court reversed the trial court's order granting summary judgment in favor of the pharmacist on the basis of the learned intermediary doctrine, it did so on the basis of the existence of genuine issues of material fact. *Id.* Specifically, the doctor testified that he only issued plaintiff a six-month prescription, without any refills, but the pharmacist continued to refill the prescription for approximately nine years, and denied that he would have done so in the absence of a current prescription from plaintiff's physician. *Id.* The Alabama Supreme Court concluded from such disputed facts that, because the pharmacist possibly dispensed the prescription without authority from a physician, plaintiff could maintain a claim against the pharmacist. *Id.* at 705. "The manufacturer's warnings accompanying the drug at the time of its purchase and sale by the pharmacy do not, as a matter of law, shield the pharmacist from liability based on breach of warranty <u>where the pharmacist continues to fill the prescription without authorization from a doctor</u>." *Id.* (emphasis added).

[7] The Washington Supreme Court explained the application of the learned intermediary doctrine to pharmacists as follows:
> The relationship between the physician-patient-manufacturer applies equally to the relationship between the physician-patient and pharmacist. In both circumstances, the patient must look to the physician, for it is only the physician who can relate the propensities of the drug to the physical idiosyncrasies of the patient.
> ...
> Neither manufacturer nor pharmacist has the medical education or knowledge of the medical history of the patient which would justify a judicial imposition of a duty to intrude into the physician-patient relationship.

*McKee*, 782 P.2d at 1050-1051. Moreover, to hold otherwise would "require the pharmacist to question the physician's judgment regarding the appropriateness of each customer's prescription." *Id.* at 1053. Such a policy, inevitably, would

14

This court also does not doubt that pharmacists recognize and accept certain ethical practices in their relations with customers. The guidelines submitted by plaintiffs reflect that fact. (*See* Plaintiffs' reply to defendants' supplemental brief in support of motion to dismiss (Doc. No. 19).) Even so, the duties encapsulated by such guidelines cannot be extended to cover defendants' pricing practices. *Cf.* Ex parte *Ford Motor Credit Company*, 717 So. 2d 781, 790 (Ala. 1997) (Shores, J. concurring) (construing Alabama statute on fraudulent suppression[8] to mean that "[t]he failure to disclose one's superior knowledge, when one is bargaining at arm's length,

---

wedge the pharmacist into the relationship between a physician and her or his patient and, thereby, interfere with ongoing treatment:
> A physician may often have valid reasons for deviating from the drug manufacturer's recommendations based on a patient's unique condition. The duty which [plaintiff] urges would result in the pharmacist second guessing numerous prescriptions to avoid liability. This would not only place an undue burden on pharmacists, but would likely create antagonistic relations between pharmacists and physicians.

*Id.* at 1053; *see also Nichols*, 817 P.2d at 1133 (reasoning that "imposing a duty on the pharmacist would intrude on the doctor-patient relationship and would force the pharmacist to practice medicine without a license"). Thus, the Washington Supreme Court concluded that the learned intermediary doctrine barred claims against a pharmacy in the following circumstances:
> [O]ur holding is narrow. The pharmacist still has a duty to accurately fill a prescription, [citation omitted] and to be alert for clear errors or mistakes in the prescription. The pharmacist does not, however, have a duty to question a judgment made by the physician as to the propriety of a prescription or to warn customers of the hazardous side effects associated with a drug, either orally or by way of the manufacturer's package insert.

*McKee*, 782 P.2d at 1055.

[8] Alabama Code § 6-5-102 (1975) provides that "[s]uppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."

15

does not violate a duty of disclosure or constitute fraud"). Justice Shores also stated in her concurrence that the Alabama Supreme Court

> declines to recognize a common law duty that would require the seller of a good or service, absent special circumstances,[9] to provide a purchaser a detailed breakdown of how the seller derived the sales price of the good or service, including the amount of profit to be earned on the sale, or else be liable for fraud.

---

[9] One form of "special circumstances" that might apply in this context, but is not alleged in plaintiffs' amended complaint, is when a pharmacist employed by defendants misrepresents the cost calculus for prescription medication upon being directly questioned by a customer. In effect, an explicit inquiry into pricing practices narrows the distance between buyer and seller in an "arms length" transaction. See Bonilla, 150 F.3d at 71 (noting that "there is nothing in the law of fraud that prevents even a single seller from charging different markups in different markets so long as there is no affirmative misrepresentation"); Katzman, 167 F.R.D. at 655 (plaintiffs unable to point to any language in retail catalog that backed their assertion that "'all the prices and deals in the Catalogues are the same for all those who receive them'").

The Seventh Circuit decision in Emery v. American General Finance, Inc., 71 F.3d 1343 (7th Cir. 1995), upon which plaintiffs rely heavily, is not contrary to the court's findings in this action. In Emery, Judge Posner found that plaintiff's allegations of mail fraud were sufficient to survive a motion to dismiss, because they evidenced behavior by defendant that was "replete with falsehoods and half truths":

> The complaint alleges, a little less clearly than could be desired but clearly enough, that while the letter sent to Emery and other customers of American General Finance implies that the customer is being offered a separate loan, when the customer shows up to take advantage of the offer the company presents him with papers for refinancing the customer's existing loan with additional funds being advanced and <u>does not disclose, indeed conceals the fact, that this method of obtaining additional funds is much more costly than taking out a new loan</u>.

Id. at 1346 (emphasis supplied). The crux of the argument in Emery is that while defendant <u>led plaintiff mistakenly to believe she would receive an affordable loan on reasonable terms</u>, she in fact received a "bad deal." See id. at 1346 ("By our calculation, the implicit interest rate that she paid for the $200 loan exceeded 110 percent per annum.") Thus, plaintiff's fraud claim survived a Rule 12(b)(6) motion. The case before this court differs in that defendants made no pledge to plaintiffs that they would receive a certain price or a certain type of deal. Rather, they offered a price, which plaintiffs paid without protest.

16

*Id.* at 790.

Indeed, there is a fundamental difference between the duty of a pharmacist to dispense prescription medications strictly in accordance with a physician's instructions, and the steps taken by officers of a multi-state retail drug chain in arriving at prices for medications sold by its various retail outlets. A pharmacist's peculiar expertise and accompanying professional responsibilities are integral to the first function, but wholly unrelated to the second.

In sum, while the conduct alleged in the amended complaint may be considered unfair or offensive, plaintiffs set forth no legitimate reasons as to why defendants have a duty to reveal their pricing practices to customers, or why they must charge all customers the same prices. *Cf. Government Street Lumber Company, Inc. v. AmSouth Bank, N.A.*, 553 So. 2d 68, 72 (Ala. 1989) (state statute imposing a duty of good faith and fair dealing does not create substantive cause of action in tort or contract, because it is directive rather than remedial). The duty of this court is not to engage in a normative analysis of what the law ought to be, but simply that of assessing how the law stands currently. *See Bonilla*, 150 F.3d at 70 (emphasizing legislature's role in crafting

17

new law pertaining to disclosure by automobile manufacturers).

Taking the factual allegations in the amended complaint as true, therefore, this court finds that plaintiffs' civil RICO claim is due to be dismissed.

That determination leaves this court with no independent jurisdictional foundation for plaintiffs' supplemental state law claims, and the court declines to assume jurisdiction. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction ....").

An order consistent with this memorandum opinion will be issued contemporaneously herewith.

DONE this 27th day of December, 1999.

*[signature]*
United States District Judge

18